IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Viva Cinemas Theaters | § | |
| and Entertainment LLC | § | |
| d/b/a Viva Cinema, | § | |
|     Plaintiff, | § | |
| | § | |
|     v. | § | Civil Action No. _____ |
| | § | |
| AMC Entertainment Holdings, Inc.; | § | |
| AMC Entertainment Inc.; American | § | |
| Multi-Cinema, Inc., | § | |
|     Defendants. | § | JURY TRIAL DEMANDED |

**Complaint**

Plaintiff Viva Cinemas Theaters and Entertainment LLC d/b/a Viva Cinema (hereinafter, "Viva Cinema") files this complaint against the above-named defendants and alleges as follows:

## I.    Introduction and Nature of the Action

1.    The City of Houston is home to many for whom Spanish is their primary language, including many in the city's Hispanic community—the third largest of any United States metropolitan area. Indeed, according to the 2010 United States Census, nearly 44% of the city's population is Hispanic. And for 34% of the city's population, Spanish is the primary language spoken at home. Before 2013, however, there were no modern multi-screen theaters in Houston devoted to the exhibition of first-run films from large Hollywood studios with Spanish subtitles or dubbed in Spanish (hereinafter, "First Run Spanish Language Films").

2.    Recognizing this, Viva Cinema developed a business plan to address this unserved market. Viva Cinema then invested substantial time and money to renovate and upgrade an existing multi-screen theater and create a premium entertainment offering comprising films; foods and beverages; and recreational and party facilities to serve the Hispanic and Spanish-speaking communities.

3.    Once defendants AMC Entertainment Holdings, Inc.; AMC Entertainment Inc.;

1

and American Multi-Cinema, Inc. (hereinafter and collectively, "AMC") learned of Viva Cinema's plans, AMC reacted by threatening the distribution businesses of seven Hollywood studios (Warner Brothers, Fox, Paramount, Disney, Universal, Sony, and Lions Gate): Warner Bros. Distributing Inc. ("Warner Brothers"); Twentieth Century Fox Film Corporation ("Fox"); Paramount Pictures  Corp. ("Paramount"); Walt Disney Studios Motion Pictures ("Disney"); Universal Film Exchanges LLC ("Universal"); Sony Pictures Releasing Corp. ("Sony"); and Lions Gate Entertainment Corp. ("Lionsgate") (hereinafter and collectively, "the Distributors," and, individually, "Distributor").

4.    In particular, AMC told each Distributor that AMC would not show *any* first run film (in English or Spanish) at one of its 30-screen theaters, located at 2949 Dunvale in Houston (hereinafter, "AMC Dunvale"), if the Distributor licensed that first run film in Spanish to Viva Cinema.

5.    AMC's threats were successful.  Although Viva Cinema commenced operations in the spring of 2013, it went out of business in November 2013 because AMC successfully employed its market power to block Viva Cinema, over a six month period, from licensing *any* First Run Spanish Language Film during the film's initial three week run except *Planes*, which—consistent with its threat—AMC refused to show at AMC Dunvale.[1]

6.    During the period of Viva Cinema's operations, AMC infrequently showed some films in Spanish or with Spanish subtitles (during matinee and not evening showings), and then, once Viva Cinema went out of business, AMC went back to its prior practices of exhibiting no, or virtually no, Spanish language films, and—if exhibiting them at all—only on an extremely limited basis.

---

[1] Viva Cinema was also able to license *The Purge* on its opening day, although that film was not produced by a major studio; it was not expected to do well but was a surprise hit.

7.     AMC's conduct was anticompetitive, unlawful, and harmful to Houston's substantial Hispanic and Spanish-speaking community.  In particular, in violation of state and federal antitrust laws and state tort law, AMC and the Distributors (1) deprived Viva Cinema of fair competitive access to First Run Spanish Films to exhibit to the Spanish-speaking film-going public in Houston; and (2) deprived the Spanish-speaking film-going public in Houston of any choice with respect to *when*, *where*, *which*, and *at what price* they could see First Run Spanish Language Films, thus injuring hundreds of thousands of members of the Houston Hispanic and Spanish-speaking communities who would have chosen—and still would chose but cannot—to attend a modern multi-screen theater (like Viva Cinema's) devoted to the exhibition of First Run Spanish Language Films.

8.     By driving Viva Cinema out of business, AMC's actions damaged competition in the licensing and Houston exhibition of First Run Spanish Language Films and damaged Viva Cinema's business and property.   Viva Cinema brings this action to obtain compensatory damages, including lost profits; treble and/or exemplary damages; expenses of litigation and costs of suit, including a reasonable attorney's fee; and other relief for violations of state and federal law by defendants.

## II.     Jurisdiction and Venue

9.     This action alleges violations of § 1 of the Sherman Act (15 U.S.C. § 1 *et seq.*) and § 15.05(a) of the Texas Free Enterprise and Antitrust Act of 1983 (TEX. BUS. & COM. CODE § 15.05) ("Texas Antitrust Act").  This action is instituted under §§ 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, 26) and § 15.21 of the Texas Antitrust Act.

10.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Viva Cinema asserts claims arising under federal law, specifically the Sherman Act, 15 U.S.C. § 1.

11.     This Court has original jurisdiction under 28 U.S.C. § 1337 because this is a civil

action arising under the Sherman Act, which is an Act of Congress protecting trade and commerce against restraints and monopolies.

12. This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(l) because Viva Cinema seeks damages in excess of $75,000 and Viva Cinema and defendants are citizens of different states, as specifically alleged *infra* ¶¶ 18-22.

13. This Court has supplemental jurisdiction of Viva Cinema's state law claims under 28 U.S.C. § 1367.

14. Venue in the Southern District of Texas is proper under 28 U.S.C. § 1391(b), as this district is the district in which a substantial part of the events giving rise to the claims occurred; and under § 12 of the Clayton Act, 15 U.S.C. § 22, as defendants, either directly or through their named subsidiaries, transact business in this district.

15. This Court has personal jurisdiction over defendants because they have, either directly or through their named subsidiaries, purposefully availed themselves of the benefits and protections offered by the State of Texas by conducting business in this State and have committed tortious acts within this State, and their conduct in, and contacts with, this State give rise to the causes of action alleged herein.

16. Defendants are found and transact substantial business in the Southern District of Texas. Many of the unlawful acts and practices at issue have been and are being carried out in whole or in part in the Southern District of Texas. All of the unlawful acts and practices alleged have caused and continue to cause damage in the Southern District of Texas to Viva Cinema, to the public interest, and to competition in interstate commerce, as alleged more fully below.

17. The licensing and exhibition of films, including First Run Spanish Language Films, is a commercial activity that substantially affects, and is in the flow of, interstate trade and commerce. Defendants' commercial activities, both in licensing films for its theaters; exhibiting

those films; and in purchasing ancillary equipment, services, and supplies for those purposes, substantially affect interstate commerce.

**III.     Description of the Parties and Co-Conspirators**

18.     Plaintiff Viva Cinemas Theaters and Entertainment LLC d/b/a Viva Cinema is a limited liability corporation organized and existing under the laws of the State of Texas with its principal place of business in Houston, Texas.   Viva Cinema operated an eight screen movie/dinner theater with 2,242 seats, having a Latin flair and offering in-theater dining, alcoholic beverages (beer, wine and mixed drinks), sports cantina, and expanded video gaming and children and family play and party area, located in Houston, Texas at the PlazAmericas Mall, 535 Sharpstown Center, Houston, Texas 77036.

19.     Defendant AMC Entertainment Holdings, Inc. is a Delaware corporation with its headquarters in Kansas City, Missouri.   Dalian Wanda Group Co., Ltd., a private Chinese conglomerate, holds approximately 80% of AMC Entertainment Holdings, Inc.'s outstanding common stock and approximately 92% of the combined voting power of its outstanding common stock.  Defendant AMC Entertainment Holdings, Inc. may be served by delivering the summons and this complaint to its registered agent, The Corporation Trust Company, which is located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

20.     Defendant AMC Entertainment Inc. is a Delaware corporation with its headquarters in Kansas City, Missouri and is a direct, wholly-owned subsidiary of defendant AMC Entertainment Holdings, Inc.   Defendant AMC Entertainment Inc. may be served by delivering the summons and this complaint to its registered agent, The Corporation Trust Company, which is located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

21.     Defendant American Multi-Cinema, Inc. is a Missouri corporation with its

headquarters in Kansas City, Missouri and is a direct, wholly-owned subsidiary of Defendant AMC Entertainment Inc. Defendant American Multi-Cinema, Inc. may be served by delivering the summons and complaint to its registered agent, C T Corporation System, which is located at 1201 Peachtree Street, N.E., Atlanta, Georgia 30361.

22.    Co-Conspirators: Various other individuals and companies not named as defendants in this action, including but not limited to the Distributors, have participated in the antitrust violations alleged herein and have performed acts and made statements in furtherance of such violations.

## IV.    Factual Background

### A.    Nature of the Motion Picture Industry

23.    The term "films" as used in this Complaint means first run, feature length motion picture films (such as "Iron Man 3"and "Monster's University") that run for more than sixty minutes and that are exhibited in theaters.  Films are a unique form of entertainment. The experience of viewing a film (*i.e.*, in a theater) differs from live entertainment (*e.g.*, a stage production), a sporting event, or viewing a motion picture in the home (*e.g.*, through DVD or a streaming service).

24.    In particular, home viewing of motion pictures is not a reasonable substitute for viewing films in a theater. When consumers watch motion pictures in their homes, they typically lose several advantages of the theater experience, including the size of screen, the sophistication of the sound systems, the opportunity to watch in 3-D, and the social experience of viewing a film with other patrons.  Additionally, most newly released or "first run" films are not available for home viewing for several months.

25.    Differences in the pricing of various forms of entertainment also reflect their lack of substitutability in the eyes of consumers. Ticket prices for films are generally different from

prices for other forms of entertainment. Tickets for most forms of live entertainment typically are significantly more expensive than film exhibition tickets. Renting a motion picture DVD for home viewing is usually significantly less expensive than viewing a film in a theater.

26.     In addition, to the consumer, the cost of viewing a first run motion picture in a theater is much greater than viewing the same motion picture at home, both because theater ticket prices are much higher than home rental options and because theater viewing imposes additional costs on consumers in the form of both driving costs (driving time, gasoline, and vehicle depreciation) plus concession costs (which are higher priced across the board than all equivalent home concessions).  Nevertheless, millions of consumers voluntarily attend first run motion pictures in theaters rather than their homes each year.  These films come to the public through a three-step process: production, distribution, and exhibition.

27.     *Nationwide and Worldwide Business.* The business of producing, distributing, licensing and exhibiting films is a nationwide and worldwide business that involves extensive activities in and affecting interstate commerce.

28.     *Interstate Commerce.* The films licensed by AMC (and that Viva Cinema attempted to license) for exhibition in their theaters (including theaters in Houston, Texas) are produced in California and elsewhere, are shipped or transmitted to various locations around the country, and are the subject of contract and payment activities on a continuous basis in interstate commerce.

29.     *Producers.* A producer is the person or company responsible for the production of a movie. A producer selects and gathers writers, directors, actors, and other talent necessary for the creation of the film. A producer also arranges for financing the project and either distributes the film itself or engages a distributor for that purpose.

30.     *Distributors.*   A distributor is a company that arranges for the marketing and

7

promotion of films and for the distribution and licensing of films for exhibition to the public in theaters throughout the United States and elsewhere. The distribution function of the motion picture industry is highly concentrated, and the film distribution rights that generate the vast majority of box office revenues are controlled by a very small number of distributors, including the Distributors, who themselves are typically owned and controlled by large Hollywood studios.

31.     *Exhibitors.* An exhibitor is a person or company that operates one or more motion picture theaters where films are exhibited or shown to the public. Many theaters (known as multiplexes, megaplexes or theater complexes) have multiple screens, each with its own auditorium, allowing more than one film to be exhibited in the theater at the same time. The highest quality multi-screen theaters have state-of-the-art sound and projection equipment and superior concession and related amenities. The most important driver of economic success for an exhibitor with a high quality multi-screen theater is fair competitive access to first run films from the larger Hollywood studios.

32.     *Film Licenses.* Distributors grant exhibitors licenses to show films for a specified, unbroken period of time (a "run").  In return, exhibitors pay the distributor a film rental, usually calculated as a percentage of the gross box office receipts the film earns from the sale of tickets to view the film.

33.     *First Run.* "First Run" means the initial showing of a new film after its release date for which an exhibitor has licensed a new film. "Blockbuster" hits aside, a modern film's theatrical exhibition life generally is no more than a few weeks (and, indeed, after approximately 90 days, the picture is released in other entertainment formats, such as DVD or streaming/pay-per-view). For this reason, a motion picture's first run typically is its only theatrical run, except for a limited number of motion pictures that will be licensed for a second run (or "sub run") in certain markets at discounted admission prices.  An exhibitor who cannot obtain license rights to

a film starting on its release date likely will never have access to the film, or will have access to it only after its theatrical exhibition value has been virtually exhausted.

34.     *Day-and-Date.* Distributors typically license a film to an exhibitor on a "Day-and-Date" basis, meaning that other exhibitors can exhibit the film at the same time, that is, on the same day and date.

35.     *Clearance and Film Zones.* A "clearance" is an exclusivity practice between a favored exhibitor and a distributor under which the distributor agrees that its film will not be licensed to play at any other competing theater within a certain geographic area (usually called a "film zone") at the same time the film is playing at the exhibitor's theater in the zone. A competing exhibitor in such a zone is able to license only films from that distributor that the clearance-owning exhibitor declines to show at its own theater (if any), which typically are less desirable films that attract fewer filmgoers.

36.     In the distant past, clearances were perceived as a way to guarantee that theaters with only one or two screens could gain access to first-run films, which enabled the early growth of the film industry.  In addition, studios knew an exhibitor would provide extra promotion or advertising in its market if it had "clearance" over a competing exhibitor in the same geographic market, which could increase interbrand competition.

37.     Now, however, clearance agreements (like those described herein) do not provide procompetitive benefits in the modern film industry.  For one, distributors no longer rely on exhibitors to promote their films at a local level but instead run national advertising campaigns. In addition, most theaters have more than one or two screens.  Indeed, it is not uncommon for large multi-screen theaters owned by major exhibitors to reside in close proximity and show the same movies.  For example, AMC and Regal operate 52 screens showing the same movies at single shopping center in Ontario:



As such, in modern times, clearance agreements restrict intrabrand competition while doing nothing to enhance interbrand competition.

38.     *Circuit Deals.*  Exhibitors who control large number of screens derive substantial market power from their ability to provide hundreds of exhibition locations or runs simultaneously to distributors for the wide release of a film in the initial weeks of a run.  "Circuit Deals" are agreements whereby distributors agree to clearances which prevent excluded exhibitors from playing the films Day-and-Date as a result of the large exhibitors' size and market power. Without such coercion, it would be in the individual, economic self interest of the Distributors to license the films for Day-and-Date play by the excluded exhibitors.

39.     *Market.* Unless otherwise indicated by the context, the term "market" as used in this Complaint means both the product market for *licensing* exhibition rights to First Run Spanish Language Films, as well as the product market for *exhibiting* such films to the public, in Houston, Texas.   First Run Spanish Language Films are a product that is not reasonably interchangeable with other entertainment products, and for which there is little or no cross elasticity of consumer demand.  Houston, Texas comprises a relevant geographic market for First Run Spanish Language Films because the vast majority of Hispanic and Spanish-speaking film goers in Houston would not travel beyond the city limits of Houston in order to see a First Run

Spanish Language Film in a theater, given the time and cost of such travel, including the substantial traffic congestion within and around the city.

40.    Before a film is released, distributors engage in extensive research, audience tracking, and sophisticated modeling to estimate its likely range of revenues in order to, among other things, determine promotional and advertising budgets. Thus, well before a film is licensed to exhibitors, distributors have a well-informed expectation as to its likely revenues.

41.    In recent years, most distributors have adopted a "wide release" strategy for the majority of their films, whereby they try to earn as much revenue as possible in the first several weeks after release by showing the film on as many screens and in as many theaters as possible. In particular, the release date "screen count" (the number of screens on which a film is exhibited on the date of its release) has become an important measure of a film's success from the distributors' perspective.

42.    Dominant exhibitors like AMC derive substantial market power from their ability to provide numerous exhibition locations or runs simultaneously to distributors for the wide release of a film, including geographic locations where a distributor has no other alternative exhibitor to play a film.

**B.    *Viva Cinema's Theater***

43.    In late 2011, Viva Cinema started looking at a closed theater property in PlazAmericas Mall.  After thorough research, Viva Cinema identified an underserved market in the area: a large Hispanic community with no access in Houston to theaters where they could view First Run Spanish Language Films.

44.    In early 2012, Viva Cinema negotiated for the available theatre property at PlazAmericas Mall, closing the deal during the spring of 2012.  In mid-2012, Viva Cinema began discussing and signing contracts with the studios during the mid-2012.

45.     By the summer of 2012, Viva Cinema had secured standard agreements to license first run films, including films dubbed in Spanish or with Spanish subtitles, from each of the Distributors.   Thereafter, Viva Cinema began renovations on the pre-existing (but closed) first run movie theater.

46.     Once completed, Viva Cinema's theater was an 8-screen, 2,242-seat theater combining film exhibition and dining located at the PlazAmericas Mall, 535 Sharpstown Center, Houston, Texas 77036 (approximate location shown as "A" below):



47.     Amenities at Viva Cinema's theater included a sports cantina with an expanded selection of food and beverage offering (including both alcoholic and non-alcoholic drinks and popular Hispanic beverages); a children and family party and play area; digital projectors and digital surround sound; all-new seating; and removable trays for transporting food and beverages.   In addition, both the sports cantina and children and family play and party area were available to patrons with or without the purchase of theater tickets.

48.     Viva Cinema opened its doors in May 2013 to provide reasonably priced

entertainment to the unserved Spanish-speaking Hispanic community.  Viva Cinema planned to showcase a mix of first-run movies with Spanish subtitles (or dubbed in Spanish) as well as some films that were natively in Spanish.

49.    The closest AMC to Viva Cinema's theater was the AMC Studio 30, at 2949 Dunvale, Houston, TX 77063, a 30-screen theater ("AMC Dunvale") (approximate location shown as "A" below):



50.    Both AMC Dunvale and Viva Cinema were modern multi-screen theaters, but they were not in substantial competition with each other both because they had substantially different film offerings and because their customers did not substantially overlap.  In particular, Viva Cinema showed films in Spanish or with Spanish subtitles, whereas AMC showed no, or virtually no, such films either before and after Viva Cinema's existence and only showed films in Spanish during limited matinee times while Viva Cinema was in business.  Put another way, AMC's theater showed films in English approximately 22-24 hours a day, while Viva Cinema showed all films in Spanish.

51.     In addition, although the two theaters were just under 3 miles apart, they served very different customer markets.  In particular, AMC Dunvale is located north of the Westpark Tollway in the Woodlake/Briar Meadow area of Houston.  By contrast, Viva Cinema was located in Sharpstown/China Town, south of the Westpark Tollway.  These two regions are distinct in terms of population demographics, such as ethnicity and economics.  In turn, the customers these two theaters served were substantially different and non-overlapping.   In particular, Viva Cinema's customers primarily came from south of the Westpark Tollway and were generally low income, Hispanic, Spanish-speaking families and individuals. By contrast, AMC Dunvale's customers primarily came from north of the West Park Tollway and were generally non-Hispanic and/or non-Spanish-speaking, with higher income levels.

52.     On average, prices for tickets, popcorn, and soft drinks mirrored the different economics of the theaters' customers: they were priced substantially lower at Viva Cinema compared to AMC's Studio 30.  By way of example, tickets were $7 at Viva Cinema versus $10 at AMC's Studio 30 for the majority of show times.  Similarly, popcorn was and soft drinks were approximately $2 and $0.50 cheaper, respectively, at Viva Cinema.  That said, despite higher ticket and concession prices, AMC's Studio 30 had more limited food and beverage choices compared to Viva Cinema.

53.     Viva Cinema did not expect to receive any resistance to its theater's presence by other theaters because Viva Cinema was filling an unmet niche in the market and was located nearly 3 miles away from any major theater.  Instead, however, AMC demanded that the Distributors not license first-run pictures to Viva Cinema until their first-run value had been exhausted.   And notwithstanding the superior value of the entertainment and concession offerings at Viva Cinema's theater, the Distributors, at the behest of AMC, gave AMC preferential treatment and deprived Viva Cinema of the ability to fairly compete on the merits for

14

film licenses, as detailed below.

C.    **AMC's Anticompetitive Conduct and Effects**

54.    AMC owns, operates, or holds interests in approximately 342 theaters with a total of 4,968 screens. Measured by number of screens, AMC is the second-largest theater exhibitor in the United States.

55.    During the fall of 2012, AMC began a national exclusionary campaign in which it used its dominant market position, and its monopoly power in a substantial number of film licensing and exhibition zones, to demand unreasonable clearances over other exhibitors in competitive zones. AMC's exclusionary practices have been reported by the Los Angeles Times and Wall Street Journal, among others, and are also the subject of other pending litigation.

56.    Because AMC has a large number of theaters and screens in the United States, the Distributors are more likely to acquiesce when AMC invokes a clearance to limit competition with other exhibitors.

57.    Distributors know that AMC can retaliate if they agree to license films on a Day-and-Date basis to another exhibitor against whom AMC has requested a clearance. AMC could retaliate by, among other things, (a) refusing to license the distributor's films for exhibition in any of AMC's theaters; (b) agreeing to license the films to play at less than all of AMC's theaters; and/or (c) licensing the distributor's films only for lesser quality or inferior AMC screens. Any of these courses of action would substantially reduce the revenues from the distributor's movies by depriving the distributor of complete access to the film-going public.

58.    As a consequence, the Distributors refuse to license exhibitors to play films Day-and-Date when AMC invokes a clearance and thereafter refuses to lift it.

59.    In accordance with AMC's national campaign, AMC demanded that the Distributors not license (or delay licensing) first-run movies to Viva Cinema, which opened for

business in May 2013. Indeed, AMC used its size stemming from its large number of theaters across the United States to persuade distributors to not license (or delay licensing) ***all but <u>one</u> First Run Spanish Language Film*** that opened during Viva Cinema's existence.

60.    This demand was a demand by AMC for preferential or exclusive film licensing treatment over Viva Cinema's theater—a demand that the Distributors (1) refuse to license certain films to the Viva Cinema theater (or else risk being denied the grossing potential of AMC's Studio 30 theater and/or some or all of the other theaters that AMC controls), and that the Distributors (2) allow AMC to play films at its Studio 30 theater day and date but refuse to license Viva Cinema's theater for day and date play with that theater.

61.    In response, the Distributors agreed to AMC's demand for exclusivity by (1) allocating films between AMC's Studio 30 theater and Viva Cinema's theater, with Viva Cinema's theater being allocated virtually none of the most popular, highest-grossing first run films during the period when those films had strong commercial value (*i.e.*, the initial 1-3 weeks of their first run).

62.    In particular, between May 2013 and November 2013, Viva Cinema's theater was only able to license <u>one</u> First Run Spanish Language Film for exhibition on the film's opening day (*Planes*).

63.    By contrast, during this same time period, AMC was able to license dozens of first-run films for opening day exhibition at AMC Dunvale including *Iron Man 3*; *The Great Gatsby*; *Star Trek Into Darkness*; *The Hangover 3*; *Fast & Furious 6*; *Now You See Me*; *This Is The End*; *Man Of Steel*; *World War Z*; *Monsters University*; *Despicable Me 2*; *The Lone Ranger*; *Grown Ups 2*; *Pacific Rim*; *Turbo*; *R.I.P.D.*; *Red 2*; *The Conjuring*; *The Wolverine*; *Smurfs 2*; *Percy Jackson: Sea Of Monsters*; *We're The Millers*; *Elysium*; *Kick-Ass 2*; *Blue Jasmine*; *The World's End*; *Insidious Chapter 2*; *Prisoners*; *Don Jon*; *Cloudy With A Chance Of Meatballs 2*;

*Rush*; *Gravity*; *Captain Phillips*; *Jackass Presents: Bad Grandpa*; *The Counselor*; and *12 Years A Slave*.

64.    Viva Cinema was unable to license any of these films within the first three weeks of their opening.  And for the vast majority of these films, the delay was 4-10 weeks or longer. Viva Cinema also was never able to license many of these films, including *Despicable Me 2*; *The Great Gatsby*; *Now You See Me*; *Monsters University*; *Blue Jasmine*; *Insidious Chapter 2*; *Prisoners*; *Cloudy With A Chance Of Meatballs 2*; *Gravity*; *Captain Phillips*; *Turbo*; *The World's End*; *Rush*; *Jackass Presents: Bad Grandpa*; *The Counselor*; and *12 Years A Slave*.

**D.     Clearance Agreements Between AMC and the Distributors**

65.    Disney and AMC agreed to prevent Viva Cinema from licensing the following First Run Spanish Language Films within the first three weeks of their opening:  *Iron Man 3*; *The Lone Ranger*; *Monsters University*; *Fox: The Counselor*; *Percy Jackson: Sea Of Monsters*; *Turbo*; *The Wolverine*; and *12 Years A Slave*.

66.    Lionsgate and AMC agreed to prevent Viva Cinema from licensing the following First Run Spanish Language Films within three weeks of their opening: *Now You See Me*; *Red 2*;

67.    Paramount and AMC agreed to prevent Viva Cinema from licensing the following First Run Spanish Language Films within three weeks of their opening: *Jackass Presents: Bad Grandpa*; *Star Trek Into Darkness*; and *World War Z*.

68.    Sony and AMC agreed to prevent Viva Cinema from licensing the following First Run Spanish Language Films within three weeks of their opening: *Captain Phillips*; *Cloudy With A Chance Of Meatballs 2*; *Elysium*; *Grown Ups 2*; *Smurfs 2*; *This Is The End*; and *Blue Jasmine*.

69.    Universal and AMC agreed to prevent Viva Cinema from licensing the following First Run Spanish Language Films within three weeks of their opening: *Fast & Furious 6*; *Kick-Ass 2*; *R.I.P.D.*; *Rush*, and *Despicable Me 2*.

70.     Warner Brothers and AMC agreed to prevent Viva Cinema from licensing the following First Run Spanish Language Films within three weeks of their opening: *The Conjuring*; *Gravity*; *The Great Gatsby*; *The Hangover 3*; *Man Of Steel*; *Pacific Rim*; *Prisoners*; and *We're The Millers*.

71.     With respect to each of the above Distributors, Viva Cinema sought to license one or more of its first run films to exhibit in Spanish but was informed by the Distributor that it would not license the film to Viva Cinema because the Distributor had agreed to AMC's demand for "clearance" for the film.

72.     These agreements prevented Viva Cinema from fair competitive access to high-grossing, popular First Run Spanish Language Films and they constitute contracts, combinations, and/or conspiracies in restraint of trade and commerce in the markets for Spanish Language Film licenses in Houston, and they have no pro-competitive justification.

73.     For one, Viva Cinema was not in substantial competition with the AMC Dunvale on Dunvale.  In particular, (1) Viva Cinema drew customers from different geographic areas of Houston, as compared to the AMC Dunvale; (2) Viva Cinema offered films in Spanish at each showing (versus zero or one time a day at AMC Dunvale); and (3) provided films and concessions at lower prices than AMC Dunvale as well as concessions aimed at Hispanic film goers.

74.     For another, "Day and Date" play has become common in the industry.  The Distributors routinely grant licenses to AMC to play day and date, both with its own theaters as well as theaters of other dominant exhibitors.

75.     To survive economically, an exhibitor like Viva Cinema needs fair competitive access to first run films.  AMC's demands for exclusivity had the effect of denying Viva Cinema the revenue it needed to stay in business.

18

76.   The unlawful and anticompetitive conduct alleged above has caused severe damage to Viva Cinema, to competition, and to the Spanish-speaking Houston film-going public:

77.   Because of AMC's conduct, Viva had access to fewer and lower quality First Run Spanish Language Films, despite the fact that Viva Cinema provided superior value compared to AMC's theaters.  In particular, Viva Cinema offered a higher quality movie-going experience per dollar spent than did the AMC Dunvale theater, both because Viva Cinema's ticket and concession prices were lower than other AMC theaters, such as the AMC Dunvale theater, and because Viva Cinema had unique offerings, including Latin-themed concessions and special entertainment facilities, described above.   Therefore, for every film license of which Viva Cinema was deprived not on the merits but as a result of the agreement of AMC and the distributors to not license films to Viva Cinema, consumers were made worse off, both because AMC's anticompetitive conduct supported maintenance of higher box office and concession prices and because it deprived the Spanish-speaking film-going public in Houston of the quality-of-experience benefits of competition between Viva Cinema and AMC theaters. AMC's conduct reduced the quality of movie theatres offered to the public and forced consumers to purchase a product that is less desirable, of inferior quality, and higher priced.

78.   AMC's demands for exclusivity also had the effect of drastically reducing any option for Hispanic and Spanish-speaking film goers in Houston to attend First Run Spanish Language Films for two reasons.  First, while Viva Cinema was in business, Viva Cinema was unable to provide such films to its customers who wanted them (with one exception noted above), despite having eight screens and multiple daily show times, whereas AMC limited any Spanish version show times of a film to single matinee showings.  Second, after AMC drove Viva Cinema out of business, AMC ceased showing any, or nearly any, First Run Spanish Language Films.  As such, AMC's anticompetitive conduct restricted output in Houston for First

Run Spanish Language Films.

79.     AMC has engaged in a continuing and continuous course of conduct with respect to the acts, practices, and conduct in violation of United States and Texas law alleged herein that have injured competition, the public, and Viva Cinema in an amount to be proven at trial.

**V.      Causes of Action**

   ***A.       Violations of Section 1 of the Sherman Act, 15 U.S.C. § 1***

80.     Viva Cinema incorporates by reference the allegations in paragraphs 1 through 79 above.

81.     After AMC learned of Viva Cinema's plan to open a multi-screen theater showing First Run Spanish Language Films, AMC and its co-conspirators, the Distributors, engaged in unlawful conspiracies, combinations, and/or contracts in restraint of interstate trade and commerce.

82.     These conspiracies, combinations, and contracts were not reasonably necessary to accomplish any pro-competitive objective.

83.     The purpose and effect of the conspiracies, combinations, and contracts was to limit or eliminate competition in the licensing and exhibition of First Run Spanish Language Films in Houston.

84.     The conspiracies, combinations, and contracts between AMC and each of its co-conspirators, the Distributors, as alleged above, substantially injured and will continue to injure the Spanish-speaking film-going public in Houston by restricting competition, restricting supply/output, increasing prices, and reducing consumer choice.

85.     By its acts, practices, and conduct described above, including by entering into the agreements described above, AMC has engaged in a course of conduct that violates Section 1 of the Sherman Act, 15 U.S.C. § 1.

86.     Viva Cinema has been injured as a result of AMC's unlawful conduct because it was unable to obtain virtually any First Run Spanish Language Films during its first three weeks of release and instead was forced to show films of lower quality or less desirability, which was not sustainable as a business.

87.     Viva Cinema seeks the recovery of its actual, incidental, and consequential damages caused by AMC's antitrust violations.

88.     Viva Cinema seeks treble damages pursuant to 15 U.S. C. §15(a).

89.     Viva Cinema also seeks the recovery of its reasonable and necessary attorney's fees pursuant to 15 U.S.C. § 15(a) of the Clayton Act.

### B.     Tortious Interference with Existing Contracts

90.     Viva Cinema re-alleges the allegations contained in paragraphs 1 through 89 above.

91.     Viva Cinema had valid contracts with the Distributors (the distribution businesses of the Warner Brothers, Fox, Paramount, Disney, Universal, Sony, and Lionsgate studios).

92.     AMC knew or had reason to know of Viva Cinema's contracts with the Distributors and Viva Cinema's interest in these contracts.

93.     AMC willfully and intentionally interfered with Viva Cinema's contracts with the Distributors.  To harm Viva Cinema, AMC intentionally and maliciously interfered with Viva Cinema's relationships by extracting unreasonable and unlawful exclusionary arrangements with the Distributors that reduced the number and limited the quality of films the Distributors would make available to Vive Cinema.

94.     But for AMC's interference, those Distributors would have made First Run Spanish Language Films available to Viva Cinema for day-and-date play. AMC's interference was the proximate cause of actual, incidental, and consequential damages to Viva Cinema, including out-of-pocket costs, liabilities to third parties, and lost profits.

95.    AMC's interference was not privileged or justified, and AMC employed wrongful means to accomplish it, including applying economic pressure to the Distributors and engaging in unlawful restraints of trade, such as threatening not to play first run films in English or Spanish if the distributor licensed the film to be played in Spanish by Viva Cinema.   Viva Cinema seeks unliquidated damages within the jurisdictional limits of this Court, as well as applicable equitable remedies, including disgorgement of AMC's profits.

96.    Exemplary damages. Viva Cinema's injury resulted from AMC's malice and/or gross negligence, which entitles Viva Cinema to exemplary damages under Texas Civil Practice & Remedies Code § 41.003(a).   Viva Cinema accordingly seeks the imposition of exemplary damages against AMC in an amount to be determined by a jury.

###### C.    *Tortious Interference with Ongoing Business Relationships*

97.    Viva Cinema re-alleges the allegations contained in paragraphs 1 through 96 above.

98.    AMC interfered with Viva Cinema's ongoing business relationships. In particular, Viva Cinema enjoyed and relationships with patrons of its theaters that would have included future economic benefits to Viva Cinema from continuing patronage to view a wide variety of films.

99.    Viva Cinema also enjoyed relationships with the seven Distributors listed above that included future economic benefits to Viva Cinema from the continued fair competitive access to the licensing of films.

100.    At all relevant times herein, AMC knew of Viva Cinema's business relationships with these patrons and Distributors; knew of the expected future economic benefits to Viva Cinema; and knew that this expectancy constituted a valuable business asset and form of revenue for Viva Cinema.  Nevertheless, AMC intentionally interfered with these business relationships.

101.    AMC's tortious interference with Viva Cinema's business relationships include AMC's targeting of Viva Cinema for exclusion from markets for Spanish Film licenses and exhibition.

102.    AMC acted improperly and without privilege in its tortious interference with Viva Cinema's business relationships with the Distributors and Viva Cinema's patrons.

103.    AMC purposely and with malice and specific intent to injure Viva Cinema disrupted and interfered with Viva Cinema's economic relationships with its patrons and the Distributors, which relationships carry with them a future economic benefit to Viva Cinema.

104.    AMC purposely and with malice and specific intent to injure Viva Cinema induced Distributors not to enter into licensing agreements with Viva Cinema and not to enter into or continue a business relationship with Viva Cinema.

105.    By depriving Viva Cinema of licenses for First Run Spanish Language Films to exhibit to patrons, AMC purposely and with malice and specific intent to injure Viva Cinema induced patrons not to buy film tickets from Viva Cinema, not to patronize its theater, and not to enter into or continue a business relationship with Viva Cinema.

106.    As a direct and proximate result of AMC's wrongful actions, Viva Cinema suffered actual damage and losses because AMC's interference prevented Viva Cinema from continuing Viva Cinema's business relationship with these patrons and Distributors.

107.    As a direct and proximate result of AMC's wrongful conduct, Viva Cinema has been foreclosed from competition on the merits and has lost revenue and profit that it would have otherwise earned but for AMC's conduct.

108.    Viva Cinema was unable to license and exhibit First Run Spanish Language Films on a fair and competitive basis and, in turn, was unable to offer other related goods and services to prospective patrons and thus was unable able to obtain the economic benefits of such sales,

both in the past and the future.

109.    AMC's actions were independently unlawful, regardless of the effect those actions had on Viva Cinema's business relationship with these patrons and Distributors.

110.    Viva Cinema seeks unliquidated damages within the jurisdictional limits of this Court, , as well as applicable equitable remedies, including disgorgement of AMC's profits.

111.    Exemplary damages.  Viva Cinema's injury resulted from AMC's malice and/or gross negligence, which entitles Viva Cinema to exemplary damages under Texas Civil Practice & Remedies Code § 41.003(a). Viva Cinema accordingly seeks the imposition of exemplary damages against AMC in an amount to be determined by a jury.

### E.    Violation of Texas Free Enterprise and Antitrust Act of 1983

112.    Viva Cinema re-alleges the allegations contained in paragraphs 1 through 111 above.

113.    As alleged above, AMC has engaged in conduct with the Distributors that defeated and lessened competition and restrained trade in the markets for First Run Spanish Language Film licenses and exhibition in Houston.  AMC engaged in such exclusive contracts with the Distributors with the specific intent and purpose to restrain trade in the markets for First Run Spanish Language Film licenses and exhibition.

114.    AMC's conduct with the Distributors constituted an illegal conspiracy, combination, and contract in restraint of trade to drive Viva Cinema out of business. As such, AMC's conduct is in violation of Texas Business and Commerce Code § 15.05(a).

115.    AMC's contracts in restraint of trade have directly and proximately caused injury to Viva Cinema in an amount to be proven at trial, including without limitation by preventing Viva Cinema from entering into competitive First Run Spanish Language Film licensing contracts with the Distributors, by preventing Viva Cinema from exhibit such films, and by

preventing Viva Cinema from attracting patrons.     Viva Cinema is entitled to compensatory damages for these injuries.   Pursuant to Texas Business and Commerce Code § 15.21(a)(1), Viva Cinema requests that the Court award Viva Cinema its actual damages, costs of suit, and reasonable attorney's fees in prosecuting its claims against AMC.

116.     AMC's actions, as described above, were willful or flagrant, in that Viva Cinema's injury resulted from AMC's malice and/or gross negligence.   Therefore, Viva Cinema seeks treble damages and reasonable attorney's fees under § 15.21(a)(1) of the Texas Business and Commerce Code.

**VI.     Jury Demand**

117.     Pursuant to Federal Rule of Civil Procedure 38, Viva Cinema demands a jury trial as to all issues triable to the jury.

**VII.     Prayer for Relief**

118.     Viva Cinema requests that the Court enter judgment and grant relief as follows:

    a.   adjudge AMC to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

    b.   adjudge AMC to have committed the torts of interference with contracts and interference with ongoing business relationships and to have done so with malice and/or gross negligence;

    c.   adjudge AMC to have violated the Texas Free Enterprise and Antitrust Act of 1983 (TEX. BUS. & COM. CODE § 15.05(a));

    d.   enter judgment for Viva Cinema against AMC for three times the amount of actual damages sustained by Viva Cinema; the expenses of litigation and costs of this action, including a reasonable attorney's fee for trial and all levels of appeal; pre-judgment interest at the highest rate allowed by law, calculated from the date of service of this complaint on AMC; post-judgment interest as provided by law from the date of judgment until paid; and any other relief to which Viva Cinema is entitled;

    e.   grant such other equitable relief, including disgorgement of all unlawfully obtained profits that the Court finds just and proper to address and/or prevent recurrence of AMC's unlawful conduct; and

    f.   grant any such other and further equitable or legal relief to which Viva

Cinema may be entitled and/or that the Court deems just and proper.

Respectfully submitted,

By:     */s/ Michael A. Hawash*
Michael A. Hawash
State Bar No. 00792061
Federal Bar No. 18321
2118 Smith St.
Houston, Texas 77002
Email: mhawash@hmgnc.com
Tex. 713-658-9001
Fax 713-658-9011
ATTORNEY IN CHARGE FOR VIVA CINEMA

OF COUNSEL:

HAWASH MEADE GASTON NEESE & CICACK LLP
Jeremy Gaston
State Bar No. 24012685
Federal Bar No. 26469
2118 Smith St.
Houston, Texas 77002
Email: jgaston@hmgnc.com
Tex. 713-658-9001
Fax 713-658-9011

**Certificate of Filing**

I certify that on April 20, 2015 I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system.

                              ____/s/ Jeremy Gaston____
                                     Jeremy Gaston